**In re DAVIDSON LUMBER CO.,**
**Davidson Timber Co., Debtors.**

**CITICORP, et al., Plaintiffs,**

v.

**DAVIDSON LUMBER CO., Defendant.**

**CITICORP, et al., Plaintiffs,**

v.

**DAVIDSON TIMBER CO., Defendant.**

**Bankruptcy Nos. 82–00442–BKC–TCB,**
**82–00443–BKC–TCB.**
**Adv. Nos. 82–0225–BKC–TCB–A,**
**82–0226–BKC–TCB–A.**

United States Bankruptcy Court,
S. D. Florida.

April 29, 1982.

John L. Britton, Fort Lauderdale, Fla., Robert O'Malley, Miami, Fla., for plaintiffs.

Louis Phillips, Miami, Fla., for debtors.

Scott Baena, Miami, Fla., for petitioning creditors.

Jerry Markowitz, Miami, Fla., for creditors.

Irving Wolff, Miami, Fla., for S. Davidson.

## MEMORANDUM DECISION

THOMAS C. BRITTON, Bankruptcy Judge.

These are two identical adversary complaints filed against two closely related corporations against whom an involuntary chapter 7 petition was filed. The complaints are filed by two major, secured creditors who seek a determination of the validity, priority and extent of their respective liens and relief from the automatic stay. The debtors have answered. The petitioning creditors, who initiated the involuntary

proceeding, have been permitted to intervene as defendants and have also answered. The two matters were tried together on April 8 in accordance with the statutory imperative of 11 U.S.C. § 362(e). The record common to both matters is docketed in the lower numbered adversary proceeding but is applicable to both.

Plaintiffs' prayer for relief from the automatic stay or, in the alternative, for adequate protection was heard on an accelerated, emergency basis on March 17. The hearing resulted in an agreed order entered that day providing for additional financing and certain safeguards, which adequately protect the plaintiffs. Therefore, no further relief is sought with respect to the prayer for adequate protection.

It is not disputed that the plaintiffs hold duly executed security agreements granting a continuing security interest in the personal property and fixtures of the two defendants and their subsidiaries as well as a duly executed Collateral Assignment assigning to the plaintiffs the interests in certain leases owned by the defendants and their subsidiaries. The security was provided for a line of credit extended by the two plaintiffs which on March 11, 1982, the date these two involuntary petitions were filed, reflected an outstanding balance including interest owed to Citicorp of $1,712,270 and a balance including interest owed to Southeast Bank of $1,378,813.

The two alleged debtors concede the validity, amount and priority ahead of all other claims of the liens just described.

The petitioning creditors, who have intervened, have challenged the liens on four grounds, which may be summarized as follows:

■ (1) The creation of the lien is alleged to constitute a preferential transfer voidable under § 547(b) and, alternatively, a part of the asserted lien is alleged to be a voidable fraudulent transfer under § 548(a). This challenge is stricken because these statutory remedies may be asserted only by a bankruptcy trustee or, under § 1107(a), by a chapter 11 debtor-in-possession. The petitioning creditors fall in neither category and, therefore, lack standing to interpose these defenses. The striking of these allegations is, of course, without prejudice to their subsequent assertion by either a trustee or a debtor-in-possession if the further progress of these cases provides such persons.

(2) It is alleged that plaintiffs lost their security interest with respect to the proceeds of collateral received during the ten day period immediately preceeding bankruptcy under the provisions of § 679.306(4), Florida Statutes, which is U.C.C. § 9–306. This matter was tried before the involuntary petition and, therefore, all parties agreed to defer the complicated accounting presented by this issue until after the involuntary proceeding. An order for relief has since been entered. Jurisdiction is, therefore, reserved to resolve this issue.

(3) It is alleged that Southeast Bank charged and collected about $50,000 excessive interest under the provisions of its contractual agreements with the alleged debtors because their contract stipulated a lower rate of interest (15%) after maturity. The obligations matured on December 11, 1981. This objection is denied.

(4) With respect to a tax refund received in 1981 by the debtors in the approximate amount of $1.3 million, it is alleged that the plaintiffs' lien lapsed on the eleventh day after the debtors used this refund to purchase a certificate of deposit. The petitioning creditors rely on § 679.306(3), Florida Statutes. This objection is sustained.

*Excessive Interest.* Southeast's original line of credit notes of June 7, 1979 (Consolidated Master Promissory Note) stipulated that the debt would bear interest at 15% after maturity. By a letter agreement executed December 11, 1981 the maturity of the debt was accelerated, but Southeast Bank continued to charge interest at fluctuating rates up to 18½% after that date and up to the date of bankruptcy. It is estimated that the 15% rate would have produced about $50,000 less than was collected by Southeast during the three months in question.

■ Southeast's interest charges after maturity are based upon a May 13, 1980 agreement between the parties executed when Southeast replaced the original lender, Flagship. The sole purpose of the agreement was to modify all the interest rate provisions in all the loan documents, including the one that provided 15% after maturity, to provide a floating rate of 2½% above prime. The prime rate at that time already exceeded 15%. The agreement, therefore, explicitly supersedes all interest rates provided in the line of credit notes including the provision which the petitioning creditors rely upon:

"1. *Interest Rate.* (a) Notwithstanding anything to the contrary contained in the Loan Documents, including but not limited to the Credit Agreement, and the Term Notes and Line of Credit Notes, from and after the date of the consummation of the purchase of the loans by BANK from FLAGSHIP, BORROWER shall pay to BANK and CUSA respectively, interest on the unpaid principal balance due under said Term Notes and Line of Credit Notes at the rate of two and one-half percent (2½%) in excess of the prime rate as determined by BANK from time to time, and with respect to CUSA, two and one-half percent (2½%) above the higher of the Base Rate or Alternate Base Rate, as defined in the Credit Agreement. Said interest shall continue to be payable in accordance with the terms set forth in the Term Notes and Line of Credit Notes. The provisions contained in Section 1.06(i), (ii) and (iii) of the Credit Agreement and as contained in the Term Notes and Line of Credit Notes shall no longer be applicable or effective."

The petitioning creditors point to the last sentence of the quoted provision and note that it expressly eliminates three provisions of the earlier line of credit notes that provided a different rate of interest for certain situations, but did not expressly eliminate the paragraph that provided the 15% rate after maturity. This argument does not outweigh, in this instance, the fact that the lenders enjoyed a bargaining advantage when this agreement was reached. The rate they agreed upon already exceeded 15% and was going up. It is inconceivable to me that the parties intended at that time to preserve a 15% rate for any purpose. It may simply have been overlooked because the Term Loan Agreement (§ 1.06) and the Citicorp Promissory Note (p. 3) both provide for maximum legal interest after maturity. The fact that the borrower has never questioned Southeast's interpretation of the modification agreement fortifies this conclusion.

I find no excessive charge of interest.

■ *Tax Refund.* The debtors used a tax refund to purchase a certificate of deposit on February 11, 1982. Plaintiffs admittedly had a perfected security interest in the debtors' general intangibles, including the refund payment. Under § 679.306(1), Florida Statutes, the certificate of deposit is admittedly "proceeds" of that collateral. The issue is whether the perfected lien continued to cover the proceeds after they were converted to a certificate of deposit. I agree with the petitioning creditors and conclude it did not.

The plaintiff lenders have argued that the certificate of deposit, like a check, should be treated as cash proceeds. If they are right, the perfected security interest would not lapse ten days after receipt of the proceeds by the debtors. § 679.-306(3)(b).

Cash proceeds are defined in § 679.-306(1):

"Money, checks, deposit accounts and the like are 'cash proceeds'."

The lenders direct us to *Citizens National Bank of Orlando v. Bornstein,* Fla.1979, 374 So.2d 6, 9, where it was said that a certificate of deposit "is best characterized as an 'instrument' under § 679.105(1)(g)". Although this case does not pass on the point before us, this comment does suggest that a certificate of deposit, like a check, could be "cash proceeds."

However, that case was decided before the effective date, January 1, 1980, of an amendment which added a statutory defini-

tion of "deposit account", a crucial phrase in § 679.306(1):

> " 'Deposit account' means a demand, time, savings, passbook, or like account maintained with a bank, savings and loan association, credit union, or like organization, *other than an account evidenced by a certificate of deposit*." § 679.105(1)(e). (emphasis added).

The sponsors' notes which accompanied this revision pointedly tie the amendment to § 679.306:

> "A definition of 'deposit account' has been added to facilitate references to such accounts in the section on proceeds. § 679.306."

This eliminates any question in my mind as to the legislative intent, at least after 1980, to exclude certificates of deposit as cash proceeds.

It follows that plaintiffs' security interest lapsed on the eleventh day because the certificate of deposit was not cash proceeds and, admittedly, the lenders did not have possession of the certificate after February 22. This conclusion does not affect the amount of the plaintiffs' lien, but it excludes the $1.3 million certificate of deposit from the reach of the lien.

The parties are directed to submit a judgment in accordance with this decision, if they can agree upon a reasonable approximation of the sum involved in point 2 above. A continued hearing will be held on Friday, May 7, 1982, at 9:30 a. m. in Courtroom 1406, 51 S.W. 1 Avenue, Miami, Florida, to resolve point 2 and to fix the terms of the judgment in the event the parties are unable to agree.

Costs will be taxed on motion.